**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: April 03 2007

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 02-37161 |
| | ) | |
| Medi-Care Orthopedic & Hospital Equipment, Inc., | ) ) | Chapter 11 |
| | ) | Adv. Pro. No. 04-3424 |
| Debtor. | ) ) | |
| | ) | Hon. Mary Ann Whipple |
| Medi-Care Orthopedic & Hospital Equipment, Inc., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| Health II of Ohio, LLC, et al., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OF DECISION**

This adversary proceeding is before the court for decision after trial on the complaint filed by Plaintiff/Debtor Medi-Care Orthopedic Hospital Equipment, Inc., ("Medi-Care"), in which it alleges a breach of the Asset Purchase Agreement under which Defendant Health II Ohio, LLC, ("Health II") acquired substantially all of Medi-Care's assets. The Asset Purchase Agreement ("the Agreement") provided for Health II holding back a total of $660,000 of the purchase price for a specified period, which amount would be payable at the end of that period if no specified events of default had occurred. Medi-Care

alleges that Health II breached the Agreement by refusing to pay the $660,000 after the hold-back period expired. Alternatively, Plaintiff alleges an indemnity claim against Defendant J. Michael Frantz ("Frantz") for any amounts that Medi-Care is not entitled to under the hold-back provisions of the Agreement.

The court has jurisdiction over this adversary proceeding under 28 U.S.C. §1334(b) and the general order of reference entered in this district. This is a core proceeding "affecting the liquidation of the assets of the estate" that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(O). For the reasons that follow, judgment will be entered in favor of Medi-Care and against Health II on the breach of contract claim and in favor of Frantz and against Medi-Care on the indemnity claim.

## FINDINGS OF FACT

Health II, Medi-Care, and Frantz, former President of Medi-Care, entered into an Asset Purchase Agreement on November 19, 2003 ("Agreement"). The Agreement was approved by the bankruptcy court on November 17, 2003. Medi-Care owned certain assets utilized in the sale and rental of durable medical equipment and supplies, the sale of uniforms, and construction of handicapped accessible items. Under the Agreement, Health II agreed to purchase substantially all of Medi-Care's assets for the sum of $2,000,000. Health II paid $1,340,000 of the purchase price at closing as required under the Agreement, and retained the $660,000 balance under the "Hold Back" provisions of the Agreement. The Agreement provided that $500,000 would be held back ("Hold Back 1") "subject to the provisions set forth in Section 1.2" and $160,000 would be held back ("Hold Back 2") "subject to the provisions set forth in Section 1.3." [Jt. Ex. 1, § 1.1]. Health II retained Hold Back 1 to ensure that Frantz would not interfere or compete with Health II's operation of the purchased business. [*Id.* at § 1.2]. Health II retained Hold Back 2 in order to protect itself from extraordinary contract loss or contract cancellation that is unrelated to Health II. [*Id.* at § 1.3]. The Agreement provides that, at the expiration of the "Hold Back Period," defined as a period of eighteen months "from the date of the letter of intent, dated May 2, 2003," [*id.* at §1.1.],[1] Health II must pay the Hold Back amounts to Medi-Care unless a breach of the Hold Back provisions has occurred [*id.* at §§ 1.2, 1.3].

---

[1] The parties disagree on what day constitutes the last day of the Hold Back Period, that is, the period during which Health II was entitled to retain the hold-back funds regardless of the occurrence or non-occurrence of a breach. Medi-Care apparently believes the last day occurred on November 1, 2004, as it argues that the hold-back payments became due on November 2, 2004. Health II, on the other hand, contends that the last day of the Hold Back Period was November 3, 2004. If the relevant time period is computed by including May 2, 2003, in the calculation, the day from which the period of time begins to run, then Medi-Care is correct and November 1, 2004, was the last day of the Hold Back Period. However, if the time period is calculated by excluding May 2, 2003, from the calculation, *cf.* Fed. R. Bankr. P. 9006(a), then November 2, 2004, was the last day of the Hold Back Period. The court need not resolve this issue as it is not material to the court's decision whether the hold-back payments became due on November 2, 2004, or on November 3, 2004.

2

04-03424-maw    Doc 58    FILED 04/04/07    ENTERED 04/04/07 16:18:42    Page 2 of 12

The sections of the Agreement setting forth the events constituting a breach of Hold Back I provide in relevant part as follows:

> 1.2.1 Frantz, either directly or indirectly, engages in, has an interest in, or aids or assists any person or entity in conducting, engaging or having an interest in . . . any business or enterprise . . . which relates to medical equipment, durable medical equipment or uniform sales and rentals in any of [thirty-five Ohio counties and five Michigan counties].
>
> 1.2.2 Frantz, either directly or indirectly, solicits customers, suppliers or patients of Buyer, or induces or otherwise contacts any customers, suppliers or patients of Buyer, or interferes with or disturbs the relationships (contractual or otherwise) [of] any customers, suppliers or patients of Buyer for business purposes in the Non-Compete Area. . . .
>
> 1.2.3 Frantz, either directly or indirectly, solicits or attempts to employ or solicit (in any capacity whatsoever), any employee, independent contractor, or consultant, of Buyer or induces or otherwise advises any employee, independent contractor, or consultant to leave the employ of Buyer or otherwise terminate its relationship with Buyer.

[*Id.* at §§ 1.2.1 - 1.2.3]. In addition, the Agreement provides that "[i]n the event of a claimed breach by Frantz, Buyer shall timely notify Seller, in writing, of such breach and Seller shall be afforded a reasonable opportunity to cure such claimed breach." [*Id.* at § 1.2.5]. Frantz agreed to indemnify Medi-Care for any breach of his obligations under the HoldBack 1 provisions. [Id. at § 1.2.6]. This indemnification provision is the basis for Medi-Care's claim against Frantz.

Section 1.3 of the Agreement provides that an "extraordinary contract loss or contract cancellation . . . which loss or cancellation is unrelated to the Buyer" constitutes a breach of the Hold Back 2 provisions. The Agreement defines "extraordinary contract loss or contract cancellation" as follows:

> [A] contract loss or cancellation which results in losses in excess of ten percent (10%) of the patient census of the continuing business (as determined by a patient census prepared in accordance with standard industry practices) during the Hold Back Period as compared to patient census levels (excluding patients of Seller's Emergency Response Center, which Seller sold to another buyer) that existed as of the date [of] the Letter of Intent, unless such cancellations or losses arise from conduct, acts or omissions of Buyer, its employees, agents or assigns.

[*Id.* at § 1.3.1].

The Agreement further provides that "[i]n the event of a breach under Section 1.2 or Section 1.3, Buyer shall be entitled to retain as liquidated damages the respective hold back amounts set forth in Section 1.1 applicable to such breach, without any requirement that Buyer prove it has incurred damages or the amount thereof," and that "[b]uyer need only prove the applicable breach has occurred." [*Id.* at § 1.4], Finally, the Agreement provides that "[b]uyer acknowledges and warrants that as of the date of execution

3

of this Agreement, that it has no knowledge of any breach of the provisions of Sections 1.2 or 1.3 of this Agreement." [*Id*. at §1.5].

### A. Facts Relating to Hold-Back 1

Included in the assets purchased by Health II was all of Medi-Care's interest in and to leases of certain real property owned by Frantz and leased by Medi-Care. The leased property included property located in Findlay and Fremont, Ohio. The leases assigned to Health II by Medi-Care were for a five-year term that began on January 1, 2002, and was to terminate on December 31, 2006. In the event of a default by the lessee, the leases provided certain remedies for the lessor as follows:

> REMEDIES IN EVENT OF DEFAULT BY LESSEE
>
> If the rent or any part thereof, shall at any time be in arrears and unpaid, with or without demand being made therefor, or if Lessee shall fail to keep and perform and observe any of the conditions of this lease, or if Lessee shall be adjudicated a Bankrupt or shall make an assignment for creditors, or if the interest of the Lessee herein shall be sold under execution, or other legal process, it shall be lawful for Lessor to enter into the premises the same as if this lease had not been made, and thereupon this lease, and everything herein contained on the part of said Lessor to be performed, shall cease and be void without prejudice, however, to the right of the Lessor to recover from Lessee all rent due up to the time of such entry. In case of such default and entry by Lessor, Lessor may re-let the premises for the remainder of the term for the highest rent obtainable and may recover from Lessee any deficiency between the amount owed by the Lessee.
>
> No waiver by the Lessor of any default or breach by Lessee or any obligation shall be construed to be a waiver of the rights of Lessor to any remedy resulting from a future default or breach by Lessee or any of Lessee's obligations.

[Health II Ex. A, p. 5, 11].

Although the leases provide for monthly rental payments, they did not specify the specific date payments were due each month. William Clark ("Clark"), an attorney for Frantz present at the closing of the Agreement, testified that, at the closing of the Agreement, Health II and Frantz entered into an agreement that rent payments would be paid on the first of each month. By contrast, Anthony Anderson ("Anderson"), administrative member of Health II, testified that he understood rent payments were not due until the thirty-first of each month since there was no payment date provided in the leases and that he, simply as a courtesy, entered into a "gentleman's agreement" with Frantz to pay the October 2004 rent by the first of the month. The court does not find Anderson's testimony on this point credible and instead credits Clark's testimony. Health II sent its rent payments to Clark, who collected the rent on Frantz's behalf. Clark testified that the payments were received several days after the first of the month during the first five or six months of 2004 but that by June or July, payments were being received much later. He

testified that while the payments were received late, the checks were almost always dated on the first of the month. Clark further testified that after not receiving the August 2004 rent, he notified Anderson that the rent must be paid timely or Health II would be evicted. Thereafter, on September 2 or 3, both the August and September rent were paid. Clark's testimony regarding rent payments is buttressed by Health II's own vendor ledger [Health II Ex. B] setting forth rent payments to Frantz during 2004 and entering the rent amount on the first of each month, as well as by Anderson's email to Frantz dated October 5, 2004, acknowledging that rents are paid prospectively, rather than in arrears as Anderson testified, and stating that he had held the August rent for an entire month after the due date [Pl. Ex. 4]. In addition to late payments, there were also several instances in which Health II's rent payment checks were returned for insufficient funds. Health II did, however, make good on those checks, and it is undisputed that Frantz accepted all of Health II's rent payments, notwithstanding their tardiness.

Relations between Frantz and Anderson became increasingly strained and rancorous beginning in late August and early September 2004. Health II had withheld the August rent, insisting on an apology to one of its employees to whom Health II claimed Frantz had been rude. Clark had notified Anderson that Health II would be evicted if its rent payment was not received by September 1. Clark sent the notification by certified mail to Anderson's home address, which Clark obtained from the Ohio Attorney General's website as well as from closing documents that related to the Agreement. Anderson testified that he interpreted Clark sending mail to his home as a "threat of sorts by Frantz." In an email dated September 9, 2004, addressed to Clark and copied to Frantz, William Ruse, the liquidating agent for Medi-Care, and Medi-Care's counsel, Anderson referred to receipt of Clark's notice as "Strike 2" and stated: "You boys obviously aren't listening. So, I'll give you the benefit of another mild warning. Health II of Ohio will be vacating all the Frantz' owned properties and abandoning the leases." [JMF Ex. E]. On September 10, 2004, Anderson sent Clark another email, again copied to Frantz, Ruse and Medi-Care's counsel, again referencing receipt of mail at his home address and stating that "[n]otice of Health II of Ohio vacating the Frantz' properties stands." [*Id.*]

In a letter dated September 27, 2004, and sent to Anderson by email early the morning of October 1, 2004, Frantz informed Anderson that he expected Health II to be out of all of the leased buildings by September 30, 2004, and expressly noted Anderson's email stating that Health II would be vacating the properties and abandoning the leases and other issues Frantz believed constituted breaches of the leases. On October 1, Anderson replied to Frantz by email sent at 5:01 p.m., noting that the date by which Frantz was demanding Health II to vacate the buildings had already expired by the time the e-mail was sent but

5

stating that he was instructing Health II to proceed with moving arrangements immediately and that he anticipated being out of the properties by mid-October. On that same date at approximately 5:30 p.m. Frantz caused a lockout of Health II at the leased buildings. At that time, Health II had not yet paid the October rent.

Anderson learned of the lockout on October 2, 2004. And on October 4, 2004, he contacted Frantz and Clark by email, copied to Ruse and Medi-Care's counsel, demanding reentry into the buildings. Not having received the October rent, Frantz agreed to allow Health II to reenter the buildings only if it paid the October rent and agreed to be out of the buildings by October 15. According to Anderson, he agreed to this "settlement" and obtained access to the buildings on October 9.

Anderson testified that, in August 2004, Health II began looking for other property to lease and had decided to move out of the properties owned by Frantz. By mid-September, he testified that Health II had decided on another location and began negotiating terms of a lease. On the morning of October 2, 2004, Health II entered into a lease agreement for the new location.

Frantz had also begun looking for new tenants for the property that was leased by Health II. On September 21, 2004, Mitchell Home Medical, Inc., ("Mitchell") signed lease agreements for both the Findlay and the Fremont property owned by Frantz. Frantz did not sign the agreement, and the agreement was not finalized until October 8, 2004, and Clark testified credibly that Mitchell did not receive the keys and access to the properties until November 4, 2004, after the expiration of the hold-back period. Anderson learned of the lease agreement with Mitchell on October 9, 2004, when Health II gained reentry to the leased premises. There is no dispute that Mitchell is a direct competitor of Health II.

**B. Additional Facts Relating to Hold-Back 2**

Between October 7 and October 16, 2003, before the Agreement was executed by the parties, an exchange of email communication occurred between Anderson and Ruse, then the general manager of Medi-Care as debtor-in possession, regarding lost business under Medi-Care's contract with Hospice of Northwest Ohio. Ruse responded to Anderson's inquiry regarding the lost business, explaining that Medi-Care lost the inpatient business but would continue to service Hospice's home customers. Ruse testified that, at the time, he calculated the resulting loss in patient census to be approximately 9%.

Anderson testified that total patient census on May 2, 2003, the date of Health II's letter of intent,

6

was 5,993, as determined in accordance with standard industry practices.[2] He further testified that Health II experienced a loss of 2,572 Hospice patients, or a 42% loss, and opined that this loss was the result of a lack of care by Medi-Care before Health II acquired the business. The court finds Anderson's causation testimony to be conclusory and not credible. The reduced patient census did not occur immediately after Medi-Care lost the Hospice inpatient business. Anderson testified the decreased census relating to Hospice patients occurred throughout the entire hold-back period. There is simply no other evidence or testimony supporting Anderson's conclusory causation testimony. Rather, Anderson indicates in an email sent to Frantz on October 5, 2004, that Health II itself had failed to perform according to expectation because it "had bitten off more than [it] could handle with the acquisition of 4 other businesses back-to-back in and round (sic) the same time of [its] acquisition in Ohio." [JMF Ex. B, p. 1]. He accepted the "faults of the company" and stated that "[i]n hindsight the human resources just was (sic) not there to matched (sic) what we committed to." [*Id.*]

Finally, Anderson testified that, as a result of Frantz locking Health II out of the leased premises, it lost another 1,168 patients who were not Hospice patients.

On or about the last day of the Hold Back Period, on November 2, 2004, counsel for Health II sent a letter to Ruse and Medi-Care's counsel notifying them that Health II will not remit the hold back amounts due to claimed breaches of the conditions of both Hold Back 1 and Hold Back 2 as specified in the letter. In the letter, Health II claimed that Frantz breached the conditions of Hold Back 1 by (1) impeding and interfering with Health II's ability to service its patients, provide employment for its employees and generally conduct business by locking it out of the locations leased from Frantz in Findlay and Fremont, Ohio, and (2) aiding a competitor to directly compete with Health II in the non-compete area.[3] To date, Health II has not remitted the hold back amounts to Medi-Care.

## **LAW AND ANALYSIS**

---

[2] At trial, there was some dispute as to whether business relating to sales of uniforms, diabetic supplies and ostomy supplies should be part of the "patient census of the continuing business" referred to in the Agreement. [*See* Jt. Ex. 1, § 1.3.1]. Although at the time Health II acquired the business, Medi-Care's business included such sales, Health II stopped selling uniforms and sold off that portion of the business relating to diabetic and ostomy supplies. Nevertheless, the court credits Anderson's testimony that the standard industry practice for determining "patient census of the continuing business" is to include only equipment "rental patients" and not "sales patients." No other testimony or evidence was offered indicating a contrary industry standard.

[3] Although the letter included additional conduct by Frantz that Health II claimed constituted a breach of Hold Back 1, on summary judgment, the court found that no reasonable trier of fact could conclude that the November 2 letter, sent on or about the last day of the Hold Back period and well after the occurrence of each alleged breach, afforded Medi-Care a reasonable opportunity to cure any of the claimed breaches and, thus, did not provide the notice required under the Agreement. Health II did not further pursue the other claimed breaches at trial.

7

## I. Overview

In its complaint, Medi-Care alleges that Health II breached the Agreement by failing to remit the $660,000 it held back under the terms of the Agreement but which, according to Medi-Care, became due and payable at the end of the Hold Back Period. According to Medi-Care and Frantz, Frantz was entitled to terminate the subject leases as a result of Health II's anticipatory repudiation of the lease agreements. They argue that neither Hold Back 1 nor Hold Back 2 were breached and, even if breached, that Medi-Care did not receive timely notice of the breach as to Hold Back 1.

Health II, on the other hand, contends that both hold back provisions were breached, thus entitling it to retain the hold back amounts. Specifically, it contends that the conditions of Hold Back 1 were breached by Frantz locking Health II out of the leased buildings in Findlay and Fremont and leasing the premises to Mitchell, a direct competitor of Health II. It argues that the conditions of Hold Back 2 were breached by a decreased Hospice patient census and a decreased census caused by the lockout. Health II further argues that it gave timely notice of the claimed breaches of Hold Back 1 and that the Agreement contains no notice requirement regarding a breach of Hold Back 2.

## II. Hold Back 1

The court first considers whether Frantz was entitled to terminate the lease agreements with Health II due to a claimed anticipatory breach of those leases. The leases do not specify governing law. They were entered into in Ohio and the leased premises are located in Ohio. Ohio law thus logically applies and no party has argued to the contrary.

Under Ohio law "[a]n anticipatory breach of contract by a promissor is a repudiation of the promissor's contractual duty before the time fixed for performance has arrived." *McDonald v. Bedford Datson*, 59 Ohio App. 3d 38, 40 (1989); *Allegro Realty Advisors, Ltd. v. Orion Assoc., Ltd.*, 2006 WL 2567665, *6 (Ohio App. 2006). "The repudiation must be expressed in clear and unequivocal terms." *McDonald*, 59 Ohio App. 3d at 40; *Sentinel Consumer Prod. Inc. v. Mills, Hall, Walborn & Assoc., Inc.*, 110 Ohio App. 3d 211, 215 (1996). An anticipatory repudiation occurs when a party gives notice to the other party that it will not perform before such party's performance is due. *Daniel E. Terreri & Sons, Inc. v. Mahoning Cty. Bd. of Commrs.*, 152 Ohio App.3d 95, 106 (2003). Anticipatory repudiation constitutes a breach of contract and notice of such "gives the offended party the freedom to cancel its obligations under the contract." *Id.*; *see Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 167 Ohio App. 3d 685, 856 N.E.2d 1008, 1018 (2006) (explaining that repudiation of a contract authorized the non-repudiating party to treat the contract as "rescinded and at an end").

8

In this case, Anderson's "Strike 2 email" stating that "Health II of Ohio will be vacating all the Frantz owned properties and abandoning the leases" is a clear and unequivocal notice of Health II's anticipatory repudiation of the leases. In case there was any doubt as to Health II's intentions, Anderson repeated in his September 10, 2004, e-mail that "[n]otice of Health II of Ohio vacating the Frantz' properties stands." There is no evidence that Anderson communicated in any fashion to the contrary to Frantz or Clark between September 10 and the October 1, 2004, lock out date. Anderson's testimony shows that Health II was acting on the expressed intention during that time in locating new premises and negotiating the terms of occupancy. Although Health II argues that Anderson's notice did not provide a specific date on which the leases would be abandoned and, thus, did not constitute an anticipatory repudiation, that argument is without merit. The email is dated September 9, 2004, and was sent to Clark and copied to Frantz and representatives of Medi-Care. The subject lease agreements did not expire until December 31, 2006. The email clearly stated Health II's intention not only to vacate the properties but also to *abandon* the leases. Simply omitting the date on which it hoped to do so does not negate the notice of anticipatory repudiation. The notice of abandonment constituted a breach of contract and entitled Frantz to exercise his rights under the remedies provision to rescind the lease agreements.

The remedies provision in the leases assigned to Health II, quoted above, is very broad and very landlord friendly, not surprisingly so since Frantz was both a landlord and president of the original tenant. The circumstances in which the remedies clause could be invoked include "[i]f the rent, or any part thereof, shall at any time be in arrears and unpaid, with or without demand being made therefor" or "if Lessee shall fail to keep and perform and observe any of the conditions of this lease." The provision specifies that upon any such default "this lease, and everything herein contained on the part of said Lessor to be performed, shall cease and be void." There is also a right of self-help allowing Frantz to reenter the premises "as if the lease had not been made"in the event of Health II's default. None of these rights are conditioned upon or limited by any requirement of notice of either breach or an election to terminate the lease. Lastly, the provision contains a broad anti-waiver clause.

Regardless of whether Health II's rent was late on October 1, 2004, its rent was late for other months, and its anticipatory repudiation of the remaining term of the leases amounted to a failure "to keep and perform and observe" a condition of the leases, namely their full term. Frantz was therefore entitled to elect to treat the lease as void and invoke the self-help right of re-entry without any particular notice to Health II, as none was required under the lease. The only date in the record upon which the court can find that Anderson and in turn Health II received notice of the September 27, 2004, letter acknowledging

9

election of termination of the lease and requiring vacation of the premises by September 30, 2004, was the October 1, 2004, date of the e-mail sent by Frantz, and acknowledged later that day by Anderson. However, due to the termination provision in the lease and the lack of any requirement of particular notice of breach or termination, the lock out after business hours on October 1, 2004, was a permitted exercise of Frantz's rights under the terms of the assigned leases. The equities are not to the contrary because, as Health II clearly communicated to Frantz, it intended to and was actually contemporaneously negotiating to leave the premises before expiration of the lease term, albeit on timing of its own choosing. *Cf. In re 1345 Main Partners, Ltd.,* 215 B.R. 536, 541-42 (Bankr. S.D. Ohio 1997).

Ohio law is not to the contrary, and is likewise friendly to commercial landlords acting under valid self-help re-entry provisions. *See generally* 2-17 *Powell on Real Property* § 17.02 (Matthew Bender & Co. 2007). Under Ohio law, the judicial forcible entry and detainer remedy set forth in Ohio Revised Code Chapter 1923 is not an exclusive remedy for commercial lessors, and, "absent a breach of the peace and pursuant to a valid lease provision, a commercial lessor may resort to self-help repossession as a remedy for a lessee's breach of the lease agreement." *Craig Wrecking Co. v. S.G. Loewendick & Sons, Inc.*, 38 Ohio App. 3d 79, 83 (1987); *Northfield Park Associates v. Northeast Ohio Harness*, 36 Ohio App. 3d 14, 20-21 (1987)(landlord engaged in peaceful self-help under valid lease clause when it re-entered premises with two security guards, one armed, on November 9, 2004, the same date it decided to do so and sent its final letter to tenant enumerating defaults); *Collins v. Northwest Catawba Marine*, Ct. App. OT-02-016, 2003 Ohio App. LEXIS 1576 (6th Dist. Ct. App. March 31, 2003). The court concludes that Frantz was entitled under the assigned leases and Ohio law to reenter the leased premises occupied by Health II and that lawfully denying Health II access to the premises did not constitute a breach of the conditions of Hold Back 1. Rather, Health II's anticipatory repudiation of the lease agreements is the cause of any interference with patient and employee relationships that occurred after its eviction.

The court also finds that Health II is not entitled to retain the Hold Back 1 amounts as a result of Frantz leasing the subject properties to Mitchell, notwithstanding the fact that Mitchell is a direct competitor of Health II. First, the court believes that Frantz was entitled to look for a new tenant, even a competitor of Health II's, after Health II's anticipatory repudiation of the lease agreement. And Frantz did not give Mitchell possession of the properties until November 4, 2004, after the expiration of the Hold-Back Period. Clark's testimony was credible and uncontradicted on this point. Thus, Frantz did not "aid or assist" Mitchell in "conducting, engaging or having an interest in any business or enterprise . . . which relates to

10

medical equipment" in the non-compete area during the Hold-Back Period. [Jt. Ex. 1, § 1.2.1]

Furthermore, Anderson testified that he learned on October 9, 2004, that Frantz had negotiated the leases with Mitchell. The Agreement required Health II to give Medi-Care timely notice in writing of any claimed breach of the conditions of Hold Back 1 and to afford Medi-Care a reasonable opportunity to cure the breach. Rather than notifying Medi-Care in October after learning of the Frantz/Mitchell lease, Health II waited until November 2, 2004. As the court found in its order denying the parties' motions for summary judgment, the November 2 notice, sent on or about the last day of the Hold-Back period, did not afford Medi-Care a reasonable opportunity to cure the claimed breach. Health II's failure to give timely notice of the claimed breach precludes it from relying on that breach, to the extent it even constitutes a breach, in order to retain amounts relating to Hold Back 1. *See Ferrando v. Auto-Owners Mut. Ins. Co.*, 98 Ohio St.3d 186, 208 (2002) (stating that whether notice is timely is determined by asking whether notice was provided "within a reasonable time in light of all the surrounding facts and circumstances").

### III. Hold Back 2

Section 1.3 of the Agreement provides that an extraordinary contract loss or contract cancellation that occurs during the Hold Back period constitutes a breach of the Hold Back 2 provisions and entitles Health II to retain the $160,000 relating to those provisions. Pursuant to the Agreement, Health II has the burden of proving that a breach has occurred. [Jt. Ex. 1, § 1.4]. Health II argues that such a loss occurred and is evidenced by a decreased Hospice patient census and a decreased census caused by Frantz locking it out of the leased premises. While the Agreement defines an "extraordinary contract loss or contract cancellation" as one that results in losses in excess of ten percent of the patient census, as determined in accordance with standard industry practice, it specifically excludes from the definition any losses that "arise from conduct, acts or omissions of Buyer, its employees, agents or assigns." [Jt. Ex. 1, § 1.3.1]. The court has already determined that the lockout was lawful and that any interference with patient relationships was caused by Health II's anticipatory repudiation of the lease agreements and, thus, any loss in patient census after the lockout does not entitle Health II to retain the Hold Back 2 amounts.

The court further finds that Health II did not meet its burden of proving that its loss of Hospice patients did not result from its own conduct, acts or omissions or that of its employees or agents. As discussed earlier, Anderson's conclusory testimony that the loss was the result of a lack of care by Medi-Care before Health II acquired the business was not credible. His testimony amounted to identifying the numbers and stating that it was Medi-Care's fault without any supporting detail from which the court could

11

conclude that he was correct. In light of the fact that the reduced Hospice patient census occurred throughout the eighteen-month Hold-Back period together with Anderson's acknowledgment that Health II "had bitten off more that [it] could handle" and that it had failed to commit sufficient human resources to the business, the court finds it more likely than not that Health II was responsible in large part for any loss of Hospice patients.  As such, the Hospice patient census decrease does not entitle Health II to retain the amounts subject to Hold Back 2.

## **CONCLUSION**

For the foregoing reasons, the court finds that Health II is not entitled to retain the amounts subject to either Hold Back 1 or Hold Back 2 and that Medi-Care is entitled to judgment in its favor and against Health II on Count One of the Complaint in the amount of $660,000. Accordingly, Medi-Care is not entitled to indemnification by Frantz under § 1.2.6 of the Agreement, and Frantz is entitled to judgment in his favor on Count Two, the indemnity claim. The court will enter a separate judgment in accordance with both this memorandum of decision